DREXEL PARK PHARMACY, INC. ET A. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Drexel Park Pharmacy, Inc. v. Commissioner
Docket Nos. 7713-76; 7715-76; 7714-76; 7716-76.
United States Tax Court
T.C. Memo 1979-518; 1979 Tax Ct. Memo LEXIS 1; 39 T.C.M. (CCH) 788; T.C.M. (RIA) 79518; December 31, 1979, Filed; As Amended April 11, 1980 *1 Held: Amounts of reasonable compensation determined. Robert E. Garfield and Douglas Paul, for the petitioners. John Graham and Joseph Crowe, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax as follows: [SEE TABLES IN ORIGINAL]
On brief, petitioners concede that amounts paid by Casale Enterprises, Inc., to John Casale constituted excessive compensation and that *2 automobile expenses and depreciation taken by Casale Enterprises, Inc., in those years were improper. The disallowance of automobile expenses and depreciation as a deduction to Casale Enterprises, Inc. resulted in preferential dividends to petitioners, Michael and Barbara L. Casale, which is likewise conceded. Thus, there is no dispute remaining in docket numbers 7715-76 and 7716-76. Two issues remain for our consideration: (1) were amounts paid by Drexel Park Pharmacy, Inc., to its president, Michael G. Casale, in the taxable years ending March 31, 1973 and March 31, 1974 in excess of reasonable compensation for personal services; and (2) were amounts paid by Casale Management, Inc. to its president, Michael G. Casale, for each of the taxable years ending October 31, 1972, October 31, 1973, and October 31, 1974, in excess of reasonable compensation for personal services? [2]
*3 FINDING OF FACT Some of the facts have been stipulated. The stipulation of facts, along with attached exhibits, are incorporated herein by this reference. Petitioners, Michael G. Casale and Barbara L. Casale, are husband and wife and resided in Warren, Ohio during the years in issue and on the date their petition was filed herein. Petitioner, Drexel Park Pharmacy, Inc. (hereafter Drexel), is a corporation organized under the laws of the State of Ohio. Its principal officer and place of business was in Warren, Ohio, for the years in issue and on the date its petition was filed herein. All the outstanding stock of Drexel is owned by the Casales. Drexel owns and operates a retail drugstore. Petitioner, Casale Enterprises, Inc. (hereafter Enterprises), is a corporation organized under the laws of the State of Ohio. Its principal office and place of business was in Youngstown, Ohio, at the time its petition was filed herein. All of the outstanding stock of Enterprises is owned by Drexel, and Michael Casale is the corporate president of Enterprises. Enterprises owns and operates a nursing home known as Sleigh Bell Residence. Parkview Nursing Home, Inc. (hereafter Parkview) *4 was a corporation organized under the laws of the State of Ohio. In 1970 it acquired Parkview Nursing Home. All of the issued and outstanding stock of Parkview was owned by Michael Casale, who was its corporate president.
Petitioner, Casale Management, Inc. (hereafter Management) is a corporation organized under the laws of the State of Ohio. Its principal office and place of business was in Warren, Ohio, during the years in issue and on the date its petition was filed herein. Michael Casale owned all of the issued and outstanding stock of Management. Drexel Park Pharmacy
Michael Casale (hereafter Casale) graduated from Ohio Northern University in 1952 with a Bachelor of Science degree in pharmacy. He is a state-registered pharmacist. After graduation, he went to work for the then owners of Drexel, and, in 1959, bought them out. When Casale acquired Drexel, the business had gross sales of approximately $70,000 annually. Since Casale's acquisition of Drexel, it has grown in both sales volume and physicla size. For Drexel's years ending March 31, 1973 and March 31, 1974, it had gross sales of $605,009 and $639,064, respectively. In addition to his work as a pharmacist, *5 Casale managed the pharmacy. He had sole responsibility for hiring and firing employees, purchasing all major items, and finances. The other two pharmacists only filled prescriptions. Casale's responsibilities with respect to Drexel may be contreasted with the operations of other pharmacies, which often divided the functions of manager, assistant manager and pharmacist. In addition to his reqular work, Casale would make himself available to fill in and work all emergency and vacation schedules. It was primarily through his managerial skills that Casale improved the profits of Drexel. He did a number of things to increase the business: he installed a postal substation to help bring in traffic; he gave green stamps with purchases; and he had Drexel advertise weekly, the only independently owned pharmacy in the area which did so. He worked hard at maintaining good customer relations and worked with his employees in obtaining this goal. He kept income tax records for people purchasing drugs from drexel, made free deliveries, and made it known to his customers that he could be contacted 24 hours a day to fill emergency prescriptions. Also, the pharmacy maintained long hours, seven *6 days a week, to better serve the community. Apart from Casale's cultivation of the community through his personal approach, he also exercised astute judgment in operating Drexel. He was able to obtain a very favorable rental, below the rental normally associated with a pharmacy having the sales volume of Drexel. He had Drexel remodeled about every five years and, in approximately 1965, added 600 square feet to the pharmacy. He added new items to the inventory of the pharmacy which caused sales to increase. Drexel was the only pharmacy in the county which had a surgical supply account. In his capacity as purchasing agent, Casale took advantage of opportunities to buy large quantities of drugs at a discount. He was able to do so only because of his intimate knowledge of the business and excellent record-keeping; he had to use care not to take advantage of a volume discount on inventory he could not turn over. Finally, petitioner paid his bills promptly, always taking advantage of discounts offered for prompt payment. During the years in issue, Drexel filled an average of 160 prescriptions daily. It employed about ten full-time and four to eight part-time employees. The two *7 highest paid employees (other than Casale) were pharmacists who each worked 38 hours per week. The "senior pharmacist" was paid a salary of $17,650 in 1972 the $18,200 in 1973. The other pharmacist was paid $8,580 in 1972 and $14,836 in 1973. Drexel was open 4,160 hours annually; during 1972 Casale was scheduled to work there as a pharmacist 752 hours and during 1973, he was scheduled to work there as a pharmacist 768 hours. In addition, he generally stopped at the pharmacy each morning on his way from home to one of the two nursing homes. For each of its taxable years ending March 31, 1970 through 1974, the following financial information is relevant with respect to Drexel's operations and Casales compensation from Drexel: Taxable Year Ending
3/31/70
3/31/71
3/31/72
Drugstore Sales
$584,812.00
$566,544.00
$590,652.00
Annual Percent
of Increase
(Decrease) in Sales
(3.12)
4.25
Casale's
Compensation
75,200.00
60,000.00
70,000.00
Compensation
12.86%
10.59%
11.85%
As Percent
of Sales
Net Profit
(Before
Casale's
Commensa-
tion)
111,070.00
88,290.00
89,059.35
Net Income per
Income Tax
Return
36,870.00
28,290.00
19,059.00
Income Taxes
13,811.00
9,530.00
5,727.00
Dividends
50.00
50.00
50.00
Ratio of Dividends
to Net Profit
(Before
Casale' Com-
pensation)
.00045
.00057
.00056
*8 Taxable Year Ending
3/31/73
3/31/74
Drugstore Sales
$605,009.00
$639,064.00
Annual Percent
of Increase
(Decrease) in Sales
2.43
5.63
Casale's
Compensation
80,200.00
84,950.00
Compensation
13.26%
13.29%
As Percent
of Sales
Net Profit
(Before
Casale's
Compensa-
tion)
94,440.01
92,541.66
Net Income per
Income Tax
Return
14,240.00
7,592.00
Income Taxes
4,335.00
2,126.00
Dividends
50.00
50.00
Ratio of Dividends
to Net Profit
(Before casale's Com-
pensation)
.00053
.00054
Eli Lilly and Company publishes an annual survey of community pharmacy operations (Lilly Digest). This survey compiles comprehensive statistics relating to these operations each year. The Lilly Digest reported the following statistical averages in 1972 for pharmacies filling over 100 prescriptions daily and having annual sales of over $400,000 (the classification group closest to Drexel's operation): the proprietor was paid a salary of $31,185, or 5.4 percent of sales; total income to the proprietor (including withdrawals) before taxes was $48,312, or 8.o percent of sales; and the proprietor worked in the pharmacy 52 hours per week. The Lilly *9 Digest reported the following statistical averages in 1973 for pharmacies having annual sales of over $600,000 and filling over 125 prescriptions daily (the classificationgroup closest to Drexel's operations that year): the proprietor was paid a salary of $40,122, or 5.2 percent of sales; he also took withdrawals of $20,862 for a total income of $60,984, or 8.0 percent of sales; the proprietor averaged 48 hours per week working for the pharmacy. For 1974, the closest statistical category to Drexel was pharmacies having annual sales of over $600,000 and filling over 150 prescriptions. The proprietor's salary averaged $44,901, or 5; percent of sales, and that proprietor also had withdrawals of $20,403, making a total income for the self-employed priprietor of $65,304, or 8.4 percent of sales. The average week worked by the proprietor was 51 hours. Of the pharmacies covered in the Lilly Digest for 1972, 1973 and 1974, Drexel ranked as one of the most successful and for each year feel within the top statistical category covered by the survey. The following tabulation shows the amounts claimed by Drexel as deductions for compensation to Casale during the taxable years ending March 31, 1973 and *10 March 31, 1974, and the amounts allowed and disallowed in the notice of deficiency: Taxable Year Ending
Claimed
Allowed
Disallowed
3/31/73
$80,200
$24,200
$56,000
3/31/74
84,950
25,562
59,388
Casale Management
Management furnished certain management services to Drexel, Enterprises and Parkview for a fee. Management employed four people during the years in issue: Michael Casale, a bookkeeper, and two registered nurses. For each of its taxable years ending March 31, 1971 through March 31, 1974, Parkview paid fees to Management in the amounts of $30,000, $30,000, $36,000 and $45,000, respectively. For each of its taxable years ending March 31, 1972 through March 31, 1974, Enterprises paid fees to Management in the amounts of $45,000, $54,000 and $60,000, respectively. [3] Management and Parkview paid dividends of $50 for each taxable year in issue, and Enterprises paid no dividends during those years. Enterprises acquired Sleigh *11 Bell nursing home in 1966. Casale possessed overall management control of Sleigh Bell as the owner of Drexel, which in turn, wholly owned Enterprises, of which Casale was president.When it was purchased, the nursing home had an occupancy rate in the low 70's as compared to a capacity of 84. Casale upgraded the home, expanded it in size, and generally made it more attractive. During the years in issue, the capacity of the home was 98 beds (45 of which were capable of providing extended care) and it had 60 employees. Casale personally spent three to five hours on three or four days a week at the home, but was always on call if any problems arose. Casale holds a nursing home administrator's license issued by the State of Ohio. Casale not only improved the nursing home from a physical standpoint, he also improved its services. He increased the size of the staff and improved the working conditions, helped train the new employees and worked with them on a continuing basis with the goal of better serving the home's patients. He got to know personally the families of the patients. He was on call at all times. At night he worked at home reading (looking for new ideas in operating *12 the home) and reviewing finances. He attended training seminars in nursing home administration. He was a member of the American College of Nursing Home Administrators. Finally, as a pharmacist, Casale spent about eight hours monthly reviewing the prescriptions of the patients in the home. He did this until about January of 1974. Bertha Barton supervised the day-to-day operation of Sleigh Bell, including such tasks as patient care and the hiring of employees. She had worked for the previous owners of Sleigh Bell as director of nursing service but became assistant administrator of Sleigh Bell when Casale took over. Barton became a licensed nursing home administrator in July 1971 and at that time Casale hired a new director of nursing services to be her assistant. Barton received compensation from Management for her services as full time nursing home administrator for Sleigh Bell in the amounts of $10,940 for 1972, $12,049 for 1973 and $11,940 for 1974. Parkview Nursing Home (Parkview) had 100 beds and was classified as a skilled care facility under Medicare. It employed approximately 68 individuals. When Parkview was acquired in 1970, Casale upgraded and improved the home. *13 He increased the number of patients, improved the physical facilities (e.g., by installing a laundry, new kitchen equipment, remodeling), and brought the home to full capacity.He operated Parkview similar to the way he operated Sleigh Bell, performing the same functions for each. Casale possessed overall management control over Parkview. He exercised this control through discussions with Joan Lewis, Parkview's assistant administrator, who supervised the daily operation of the business. Casale participated in the personnel and financial decision making and ultimately made all final decisions. As was the case with Sleigh Bell, Casale was physically present at Parkview three to four days per week, three to five hours daily. He was also on call if any problems arose at Parkview. Lewis was paid an annual salary of $10,397 for 1972, $11,148.80 for 1973 and $11,203.23 for 1974, while administrator at Parkview. Actual payment of the salary came through Management. At the time of trial, Lewis was employed as administrator of the Imperial Nursing Center in Warren, Ohio at an annual salary of $14,500. Imperial Nursing Center is a 120-bed skilled facility and qualified under Medicare. *14 In 1971 and 1974, the Regional Medicare Director in Region V at Chicago, Illinois, which includes the States of Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin, conducted surveys of full time administrative salaries paid to individuals other than owners in both proprietary and nonproprietary skilled nursing facilities. These surveys show the following salary ranges for full time nursing home administrators: 1971 Survey
1971 Survey Bed Size
Range
Range
75 - 99
$8,000 - $22,000
$8,000 - $25,999
100 - 149
$9,000 - $23,000
$7,000 - $27,999
For each of the taxable years ending March 31, 1970 through March 31, 1974, Enterprises had gross receipts, taxable income, income tax and book equity (adjusted to include accumulated depreciation) from its Sleigh Bell Nursing Home as follows: Taxable Year
Cross
Taxable Ending
Receipts
Income
Income Tax
Book Equity
3/31/70
$466,489.00
$ 34,567.00
$12,608.00
$ 131,182.72
3/31/71
483,160.00
40,226.00
14,487.00
292,739.48
3/31/72
504,785.00
41,085.00
14,308.00
343,795.98
3/31/73
537,253.00
39,182.00
12,770.00
404,573.43
3/310/74
571,122.00
39,946.00
13,580.00
466,713.88
*15 For each of the taxable years ending March 31, 1971 through March 31, 1974, Parkview had gross receipts, taxable income, income tax and book equity (adjusted to include accumulated depreciation for assets carried on the tax returns) as follows: Taxable Year
Gross
Taxable Ending
Receipts
Income
Income Tax
Book Equity
3/31/71
$474,275.00
$40,154.00 $ [4]
$71,942.75 [5]
3/31/72
483,228.00
17,234.00
4,764.00
64,156.02 [6]
3/31/73
515,698.00
5,994.00
1,239.00
84,961.04 [7]
3/31/74
548,849.00
11,504.00
3,782.00
107,480.00
*16 During the same taxabnle years Parkview had book assets at cost which ranged from a low of $118,681 to a high of $141,429 and during the taxable years ending March 31, 1970 through March 31, 1974, Enterprises had book assets at cost which ranged from a low of $612,483.00 to a high of $648,239. For each of its taxable years ending October 31, 1971 through October 31, 1974, Management had gross receipts, compensation paid to Casale, taxable income, income tax and book equity (adjusted to include accumulated amortization per income tax returns) as follows: Taxable Year
Gross
Compensation
Taxable Ending
Receipts
to Casale
Income
10/31/71
$ 88,750.00
$71,667.00 $ 531.00
10/31/72
82,430.00
50,000.00
66.00
10/31/73
100,905.00
70,000.00
2,268.00
10/31/74
130,114.00
83,333.00
1,719.00 Taxable Year Ending
Income Tax
Book Equity
10/31/71
$149.00 $ 924.28
10/31/72
19.00
1,006.03
10/31/73
506.00
2,894.91
10/31/74
481.00
$4,351.99
For the taxable years ending March 31, 1971 through March 31, 1974, Nterprises and Parkview had combined book equity, as adjusted, and combined taxable income, as follows: Taxable Year
Book Equity of Ending
Enterprises and Parkview
Taxable Income
3/31/71
[8] $ 364,682.13
$ 80,380.00
3/31/72
407,952.00
58,319.00
3/31/73
[9] 489,534.47
45,176.00
3/31/74
574,193.88
[10] 51,450.00
*17 For the taxable years ending March 31, 1973 and March 31, 1974, Drexel and Enterprises had total book equity, as adjusted, of $651,859.25 and $770,883.94, for each year successively, and Drexel, Enterprises and Parkview had total book equities, as adjusted, for both years combined of $1,555,184.23. During 1971, 1972, and 1973, Casale had various personal investments, including three or four rental properties, seven to 11 partnerships, eight to 13 corporations and two farm graves in Florida, totaling *18 15 acres.Casale incurred no net losses in items reported on his income tax return as "Income other than Wages, Dividends, and Interest" for 1971, but reported a net loss of $55,929 for 1972 and a net loss of $95,909 for 1973 from his various investments. The following tabulation shows the amounts claimed as compensation by Management to Casale during the taxable years ending October 31, 1972, October 31, 1973 and October 31, 1974, and the amounts allowed and disallowed in the notice of deficiency: Taxable Year Ending
Claimed
Allowed
Disallowed
10/31/72
$50,000
$40,000
$10,000
10/31/73
70,000
44,000
26,000
10/31/74
83,00
48,400
34,933
OPINION We must determine the amount of compensation paid to petitioner by Drexel for its taxable years ending March 31, 1973 and 1974 and by Management for its taxable years ending October 31, 1972 through 1974, which is allowable as deductions for Federal income tax purposes.The deductibility of compensation paid by these corporations is based upon the application of section 162(a)(1), [11] which permits a taxpayer *19 to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." In support of the value of the services rendered by petitioner to Drexel, Drexel emphasizes a number of factors. First, it points to Casale's educational bankground and twenty years of experience. Drexel also points out that Casale performed many duties for the pharmacy; he served as pharmacist, salesman, purchasing agent, executive and financial assistant to the pharmacy. Casale made all the major managerial decisions for the pharmacy, including the hiring and firing of personnel. Drexel emphasizes the exceptional growth in the sales of the pharmacy between 1969 and 1974 (from $70,000 to over $600,000 annually), and points out that it became one of the top independent pharmacies in sales in the U.S. This growth, Drexel claims, was in the face of intense competition, and was due in large part to Casale's unusual business skills, which were very valuable to Drexel. Respondent counters with the basic assertion that the inherent value of petitioner's *20 services to Drexel was far less than Drexel paid him. While respondent makes a number of arguments in support of this assertion, he relies primarily upon two. First, he claims that because Casale divided his time between the two nursing homes and the pharmacy, he can be considered to have worked only part-time for the pharmacy, and his compensation should be determined accordingly. Respondent ties this contention to the comparative compensation levels for full time proprietors of pharmacies. Respondent also points to the absence of significant dividends paid by Drexel as evidence that Casale's compensation constituted, in part, return on investment (in lieu of dividends).
Both parties make their same respective basic arguments with respect to the salaries paid by Management to Casale. Management contends that Casale's services were very valuable to the nursing homes. In addition to claiming that Casale had excellent background and experience for the administration of nursing homes, Management points to increased revenues of the homes, upgraded patient care and expanded capacity.Casale performed numerous tasks necessary to the running of a nursing home, and became personally familiar *21 with the patients and their families. Respondent raises a number of arguments in contesting the value of petitioner's services, but he again relies primarily upon the part-time nature of the services, comparable salaries of other nursing home administrators, and the nominal dividends paid by Management. Respondent also claims that careful analysis reveals that the nursing homes were not a successful as Management asserts. Section 1.162-7(a), Income Tax Regs., states: The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. Section 1.162-7(b)(3) goes on to explain: It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. Thus, to be deductible, it must be established that the payments: (1) were actually intended to be paid purely for the services, and (2) did not exceed a reasonable compensation for the services actually rendered. Sec. 1.162-7, Income Tax Regs. *22 ; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); Nor-Cal Adjusters v' Commissioner,503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Whether the respective petitioners intended the payments to be compensation for services presents a question of fact, to be resolved on the basis of all the surrounding facts and circumstances. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,supra.Similarly, the reasonableness of the amount of the compensation presents a factual issue. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinon of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), *23 affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The factors generally considered relevant in determining the reasonableness of compensation include: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this *24 Court.] Commercial Iron Works v. Commissioner,166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 568; Dahlem Foundation, Inc. v. Commissioner,54 T.C. 1566, 1579 (1970). No single factor is decisive; rather, we must consider and weigh the totality of the facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra.
We will now examine the salaries paid to petitioner from each corporation in the light of the framework established by the regulations and the cases referred to above. Casale's Compensation from Drexel
At the time of the years in issue, Casale had had 20 years of experience as a pharmacist and at least 14 years experience in drug store management. Additionally, he holds a B.S. degree in pharmacy and is a state qualified pharmacist. There is, however, nothing particularly unique about petitioner's qualifications. His experience and training are generally the same as that of any other pharmacist in Ohio. Thus, the services which petitioner performs, at least as *25 they relate to his training and experience, can fairly be related to comparable salaries of other pharmacists, and certainly other pharmacist-proprietors. In 1959, Casale bought out the owners of Drexel. At that time, Drexel had gross sales of approximately $70,000 annually. During fiscal 1973 and 1974, the years in issue, Drexel had sales of approximately $605,000 and $639,000, respectively. Drexel claims that its success was due to Casale's business acumen. In building up Drexel's business and profits, Casale used a number of different marketing techniques. These included bringing in a postal substation, giving green stamps, constant remodeling, taking advantage of volume discounts where advantageous, and obtaining a favorable rental for the pharmacy, among other things.
Respondent attempts to denigrate the value of Casale's services by pointing out that we are interested in the value of petitioner's services in 1973 and 1974 and therefore the improvement in Drexel's sales since 1959 is irrelevant. Respondent points out that from March 31, 1970 through March 31, 1974, gross sales increased only 9 percent in contrast with a corresponding increase in the cost of living of *26 27 percent. We believe that the growth of Drexel's sales since 1959 is relevant in determining the value of Casale's services. The total improvement in Drexel's sales during the period of Casale's ownership is indicative not only of the value the services which he rendered to Drexel during those years, but also as to the value of services which he renders to Drexel on a continuing basis. The record leaves no doubt that it was through Casale's efforts that Drexel became the successful pharmacy which it was during the years in issue. The Lilly Digest contains data regarding the average earnings of the proprietors of pharmacies comparable to Drexel. In 1973 those proprietors, working 48 hours weekly, were paid an average salary of $40,122. In addition, they received net profit withdrawals which averaged $20,862, for a total income of $60,984. In 1974 these proprietors, working an average 51-hour week, were paid an average salary of $44,901, plus profit withdrawals of $20,403, for a total average income of $65,304. As compared with these averages for Drexel's year ended March 31, 1973, Drexel paid Casale $80,200 for working approximately 16 hours per week. For the year ended *27 March 31, 1974, Casale was paid $84,950 for working about 16 hours weekly. The fact that Casale was physically present at Drexel only about one-third the amount of the time as those proprietors covered in the Lilly study is a factor tending to show that petitioner was overcompensated. Charles Schneider & Co. v. Commissioner. supra at 154. Compare Levenson & Klein, Inc. v. Commissioner,supra, in which the amount of compensation was not found unreasonable despite the part-time nature of the services. However, we are loathe to value services rendered on such a quantiative basis when qualitative factors such as the business success so obvious here provide such an objective means of valuation. Additionally, the record indicates that petitioner did spend time, apart from those periods when he was physically present at the pharmacy, working on its problems. Although physical presence on the job is a relevant consideration when the issue is one of reasonable compensation, in the instant case we believe it does not carry great weight in light of the other *28 data available. The value of services rendered may go far to mitigate their part-time character. Miller Manufacturing Co. v. Commissioner,149 F.2d 421 (4th Cir. 1945). Cf. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 746 (1973). Casale had the responsibility for making all major managerial decisions, including the hiring and firing of personnel, determining the suppliers from whom the purchases would be made and the continued assessment of the company's financial position. These duties were in addition to his duties as a pharmacist. The record does indicate that pharmacies such as Drexel, with a large prescription volume, often have a manager and assistant manager to perform the executive functions, in addition to the pharmacists who fill the prescriptions. It is clear that Casale alone managed the pharmacy and, in addition, worked part-time as a pharmacist, as the working schedule of the other pharmacists required. Because he performed these several functions, this would tend to justify a salary in excess of the average proprietor-pharmacist operating a pharmacy. Drexel does not appear to have been overly generous with the salaries *29 it paid its other personnel. For instance, drexel paid the "senior pharmacist" $17,650 for full-time (38 hours per week) employment in 1972 and $18,200 for full time employment in 1973. The next highest paid employee was the other pharmacist, who was paid $8,580 in 1972 and $14,836 in 1973 for full-time employment. The following table sets forth Casale's salary, together with statistical comparisons which we consider relevant in analyzing its reasonableness: Drexel Statistics
Net Profit (Before
Casale's FYE
Gross Sales
Casale's Compensation)
Compensation
3/31/70
$584,812
$112,070.00
$ 75,200
3/31/71
566,544
88,290.00
60,000
3/31/72
590,652
89,059.35
70,000
3/31/73
605,009
94,440.01
80,200
3/31/74
639,064
92,541.66
84,950 Percentage, Casale's
Percentage, Casale's Compensation to
Compensation to Gross Sales Net Profit
12.86 %
67. 1 %
10.59
68.0  11.85
78.6  13.26
84.9  13.29
91.8  Independent Pharmacy Averages Per Lilly Digest
Net Profit (Before
Manager's or
Manager's Salary
Proprietor's Year
Gross Sales
and Before Taxes)
Salary
1972
$ 582,695
$ 48,312
$ 31,185
1973
765,835
60,984
40,122
1974
775,434
65,304
44,901
*30 Percentage, Manager's
Percentage, Manager's Salary to Gross Sales
Salary to Net Profit
5.4 %
64.5 %
5.2
65.8  5.8
68.8  There are several characteristics about Casale's salary which are striking. First, his compensation seems to have been high relative to industry averages, even prior to the years in issue, and it also appears to have been at least somewhat related to sales. Second, even though the percentage of Casale's salary to Drexel's net profit exceeds the Lilly Digest average, so too his net profit before compensation far exceeds that of the average, and on fewer sales. As far as the record indicates, this hgh net profit is due to Casale's management efforts. Drexel paid dividends of only $50 in each of the taxable years in issue. This raises the obvious inference that Casale was receiving dividends in the form of salary compensation. Charles Schneider & Co. v. Commissioner,supra at 153. Respondent strengthens this inference by pointing out that for the taxable years ending March 31, 1970 through March 31, 1974, Drexel's dividends did not represent any reasonable return on investment. We believe that this factor *31 provides the strongest evidence that Casale was overcompensated. Taking into account all the factors mentioned above, we find that Casale's reasonable compensation from Drexel was $60,000 for the taxable year ending March 31, 1973 and $65,000 for the taxable year ending March 31, 1974. Casale's compensation from Management
Management is a corporation which provides management services to the two nursing homes: Sleigh Bell, a nursing home of 98 beds, 45 of which are capable of providing extended care to patients, staffed by 60 employees; and Parkview, a "skilled care facility" of 100 beds employing approximately 68 individuals. Casale was, during the two years in issue, administrator of the two facilities. As a result of Casale's services, Management was paid a fee by Enterprises (which owned and operated Sleigh Bell) and by Parkview. Management, in turn, paid Casale for his services Casale was paid salaries of $50,000, $70,000 and $83,333 by Management for the years ending October 31, 1972, October 31, 1973 and October 31, 1974, respectively. Management claims that the operation of a nursing home is a risk-laden business with the obvious inference that to operate *32 one takes great skill for which one should be compensated accordingly. Management also points to changes which Casale made in the operation of the nursing homes when they were acquired, as having generated the increases in gross receipts. We are not persuaded by Management's arguments as to the risks inherent in the nursing home business and their effect upon salaries in the industry. The fact that a business involves significant risks would seem to relate to the expected rate of return on investment rather than the level of employee salaries. Thus, it appears that in this argument Management is improperly mixing Casale's dual roles as owner and employee. In deciding the issue before us, we are concerned only with his compensation as employee. Moreover, the statistics in this case with regard to employees other than Casale, tend to disprove petitioner's argument. Lewis was paid $10,397.20, $11,148.80 and $11,203.23 to supervise Parkview Nursing Home in 1972, 1973, and 1974, respectively. At the time of trial, she was employed by the Imperial Nursing Center, a 120-bed skilled facility, at an annual salary of $14,500. Barton, the administrator of Sleigh Bell, receiving compensation *33 for her services in the amounts of $10,940 for 1972, $12,049 for 1973, and $11,940 for 1974. In our view the salary levels of Lewis and Barton tend to indicate that salaries paid in the nursing home industry were no more than ordinary in amount.While it is true that Casale's skills were entrepreneurial, as opposed to those of Lewis and Barton, whose skills were more ministerial, considering the part-time nature of Casale's employment, the divergence in salary levels seems inappropriately large. Finally, surveys conducted by the Regional Medicare Director in Region V, which includes Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin, showed that salaries paid to full-time nursing home administrators (other than owners) ranged as follows: 1971 Survey
1974 Survey Bed Size
Range
Range
75 - 99
$8,000 - $22,000
$8,000 - $25,999
100 - 149
9,000 - 23,000
7,000 - 27,999
Thus, it seems clear that whatever risks are associated with nursing home operations, successful administrators do not reap inordinate benefits in the form of salary. Certainly Casale's skills as a pharmacist were a positive feature relative to the operation of the homes. However, *34 prior to 1966, when Sleigh Bell was purchased, Casale had no experience in the operation of nursing homes. His only qualifications as of the time of trial would be his operation of the nursing homes since their acquisition and his attendence at seminars relative to nursing home operation. He also had an Ohio nursing home administrator's license. Although we noted previously that Casale was a good administrator, we do not believe his qualifications make him so unique as to warrant the salary which he was paid by Management. Casale's responsibility for running the nursing homes did not appear to be any greater than those of the average nursing home proprietor. Certainly, he had ultimate responsibility for making decisions, but it is apparent that the assistant administrators in each home supervised their daily operation.Casale did not work full time at either nursing home; rather, he worked three to five hours three or four days per week at each home. While Casale spent time becoming acquainted with families of residents, this facet would more properly be reflected in increased receipts rather than seen as a duty of the proprietor.Indeed, Management alleged this to have been an *35 "extra" provided by Casale which caused the increase in receipts. On the other hand, we do give some weight to the fact that Casale served as pharmacist for the homes. This additional duty required six to eight hours per month and definitely increased his value to the homes. For each of the taxable years ending March 31, 1970 through March 31, 1974, Enterprises derived, from its Sleigh Bell Nursing Home, gross receipts and taxable income as follows: Taxable Year
Gross
Taxable Ending
Receipts
Income
3/31/70
$466,489
$34,567
3/31/71
483,160
40,226
3/31/72
504,785
41,085
3/31/73
537,253
39,182
3/31/74
571,122
39,946
For each of the taxable years ending March 31, 1971 through March 31, 1974, Parkview had gross receipts and taxable income as follows: Taxable Year
Gross
Taxable Edning
Receipts
Income
3/31/71
$474,275
$40,154
3/31/72
483,228
17,234
3/31/73
515,698
5,994
3/31/74
548,849
11,504
For each of its taxable years ending October 31, 1971 through October 31, 1974, Management had gross receipts, paid compensation to Casale and had taxable income as follows: Taxable Year
Gross
Compensation
Taxable Ending
Receipts
to Casale
Income
10/31/71 88,750
$71,667 $ 531
10/31/72
82,430
50,000
66
10/31/73
100,905
70,000
2,268
10/31/74
130,114
83,333
1,719
*36 We are confident that Casale was a good nursing home administrator. Gross receipts from each home increased over the period in issue. However, while the growth of Drexel's business was extremely dramatic, the growth of the business of the nursing homes was gradual. Those figures do not "speak for themselves" as was the case with Drexel. Management claimed deductions for compensation paid to Casale for the years ending October 31, 1972, October 31, 1973 and October 31, 1974 in the amounts of $50,000 $70,000 and $83,333, respectively. During the same period, the gross receipts of Sleigh Bell and Parkview increased, but not nearly as sharply as Casale's salary. The foregoing gross receipts statistics give no indication as to why Casale's salary should have increased so dramatically between October 31, 1972 and October 31, 1974. Finally, we note that Management paid dividends of only $50 in each of the taxable years in issue. As in the case of Drexel, the absence of significant dividend payments tends to indicate that net income which would otherwise have been distributed as nondeductible dividends was actually paid to Casale in the guise of salary. Taking into account all *37 of the factors discussed above, we believe that respondent has correctly determined Casale's salary from Management. We, therefore, sustain that determination.
Decision will be entered under Rule 155 in docket No. 7713-76 and 7716-76.
Decisions will be entered for respondent in docket Nos. 7714-76, 7715-76.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Casale Management, Inc., docket No. 7714-76; Casale Enterprises, Inc., docket No. 7715-76; and Michael G. & Barbara L. Casale, docket No. 7716-76.↩
2. Resolution of the issues set forth above will necessarily determine the deductible amount of profit sharing contribution made by Casale Management on behalf of Michael Casale for the year ending October 31, 1974 and the proper amount of earned income to be taken into account for purposes of determining the maximum tax of petitioners, Michael G. and Barbara L. Casale, for their taxable years ending December 31, 1972 and December 31, 1973.↩
3. Enterprises also paid fees to Drexel, apparently for administrative services, in each of its taxable years ending March 31, 1970 and March 31, 1971 in the amounts of $24,000 and $22,000, respectively.↩
4. For the year ending March 31, 1971 Parkview Nursing Home, Inc. was a small business corporation which made the election authorized by section 1372. ↩
5. For reasons not apparent from the record respondenths tabulation on brief has omitted the book equity of Parkview for the year ending March 31, 1971. ↩
6. Respondent's tabulation on brief indicates that the took equity of Parkview for the year ending March 31, 1972 was $64,156.07. The figure appearing in this table is derived from respondent's exhibit T. There is no apparent reason for the disparity. ↩
7. Respondent's tabulation on brief indicates that the book equity of Parkview for the year ending March 31, 1973 was $74,961.04. The figure appearing in this table is derived from respondenths exhibit U. There is no apparent reason for the disparity.↩
8. For reasons not apparent in the record respondenths tabulation on brief omitted book equity for the year ending March 31, 1971 of Parkview. See fn. 5. He also omitted book equity for the same year for Parview and Enterprises combined, which we have inserted in the table set forth about. ↩
9. Respondent's tabulation on brief has understated the book equity of Parkview by $10,000 for the year ending March 31, 1973. See fn. 7. ↩
10. Respondent's tabulation on brief indicates that the combined taxable income of Parkview and Enterprises for the year ending March 31, 1974 was $51,550. Respondent's exhibits G and V support the figure appearing in the table set forth above.↩
11. All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.↩